Joshua R. H. Potts, Appellee, v. Grand Lodge Ancient Order of United Workmen of Iowa, Appellant.

Gen. No. 36,201.

328

Opinion filed April 11, 1933.   Rehearing denied April 24, 1933.

DENEEN, HEALY & LEE, for appellant; ROY MASSENA and DONALD N. SCHAFFER, of counsel.

EUGENE VINCENT CLARKE, for appellee.

JOSHUA R. H. POTTS, *pro se.*

Mr. Justice Gridley delivered the opinion of the court.

In an action in assumpsit to recover the loan values mentioned in three certificates of life insurance issued by defendant to plaintiff, the court, on plaintiff's motion, on July 14, 1932, struck from the files defendant's third amended affidavit of merits (accompanying its plea of the general issue to plaintiff's declaration), defaulted defendant for want of an affidavit of merits, assessed plaintiff's damages at $2,790 (being the aggregate loan values mentioned in the three certificates), and entered judgment against defendant in that sum. The present appeal followed.

The ultimate question to be decided is whether the affidavit of merits stated one or more sufficient defenses to plaintiff's action.

In plaintiff's declaration, filed June 9, 1932, after stating that defendant is a fraternal insurance society, incorporated under the laws of Iowa and authorized to do business in Illinois, and that he has three causes of action against defendant on three certificates of insurance, he alleged in count one that defendant, on February 21, 1917, executed and delivered to him its certificate of life insurance, No. 14,353, and therein promised and agreed, among other things, that it would make a "cash loan" to him of $780. The certificate is set out in full, the material provisions of which are in substance as follows:

That Joshua R. H. Potts (plaintiff) is a member in good standing of Peabody Lodge, No. 143, of the Society, in Chicago, and entitled to all the rights and privileges of such membership; that in case of his death in good standing his wife, as beneficiary, is entitled to participate in the beneficiary fund of the Society to the amount of $2,000, which sum, subject to certain mentioned conditions, shall be paid within 90 days after proof of the member's death; and that "this cer-

tificate, the application for membership and medical examination, the articles of incorporation, by-laws, rules and regulations of the Society, *now in force or which may hereafter be enacted or adopted,* shall together constitute the contract between the Society, the member and the beneficiary."

Under the heading "Condition," is the statement that the law of Illinois, or ruling of the Commissioner of Insurance, "does not permit fraternal societies to give an option in cash to their members; therefore, the figures under 'cash loan value' in the following table will not be available to the member . . . *unless* the law or ruling *is changed* so as to permit such option, in which event the option will be effective from the date of this certificate." Then follows, under the heading "Guaranteed Options," a table or schedule as to "Cash Loans, Paid up Certificate and Extended Insurance Values," in which the cash loan value, after the certificate has been in force *for fifteen (15) years,* is stated to be "$780." In the table, also, are stated respectively the cash loan values in lesser amounts from three to fourteen years. And it is further stated that "after *three* years continuous membership, the member . . . will be entitled at his election to *one* of the options set forth in the above table." Under the heading "Cash Loans," it is further stated that "upon written application to the Home Office of the Society at Des Moines, Iowa, the member *will be entitled to receive a cash loan,* as per above schedule, *upon the sole security* of this certificate, and *provided* the insured *executes a loan agreement,* as per a form to be furnished by the Society, such application to be accompanied by the certificate and evidence that the current dues and assessments have been paid."

In said count one of the declaration plaintiff further alleged that he has at all times kept and performed all the terms and conditions of the certificate upon his

part to be kept and performed; that he has paid all required dues and assessments; that since February 21, 1917, he has continuously been a member of the society and said certificate has been in full force and effect; that the law of Illinois, stated in the certificate as not permitting fraternal societies to give an option in cash to their members, "was changed so as to permit such option"; that on February 15, 1932, plaintiff made written application to defendant at its home office "for a cash loan of $780," and at the same time "executed a loan agreement as per a form furnished by defendant," and forwarded both, together with his certificate and evidence of his having paid all dues and assessments to defendant; that by reason of the foregoing defendant, on February 21, 1932, "became liable *to pay* to plaintiff the sum of $780, as in and by said certificate by it promised and agreed"; but that, although often requested, it has refused to pay said sum, to plaintiff's damage, etc.

Other counts of the declaration relate to claimed causes of action upon the other similar certificates. The allegations are substantially the same, except that in the second cause of action the count is predicated upon defendant's certificate issued on February 21, 1917, for $3,000, in which the cash loan value after the certificate has been in force for 15 years is stated to be $1,170, and in the third cause of action the count is predicated upon defendant's certificate issued on June 1, 1925, for $5,000, in which the cash loan value after the certificate has been in force for 6 years is stated to be $840.

In plaintiff's affidavit of claim are allegations similar to those in the declaration with reference to the provisions of the certificate and plaintiff's application for loans thereon. It is stated that the applications were made on forms provided and filled in by defendant "charging 6 per cent interest." And the affidavit

concludes with the statement that there is now due from defendant the said several sums of $780, $1,170 and $840 (a total of $2,790) with interest, etc.

Defendant's said amended affidavit of merits was signed and sworn to by W. H. Stowell, grand recorder of defendant, and filed on July 13, 1932, and its allegations are in substance as follows:

That defendant conducts its business as a fraternal beneficiary association, in accordance with certain sections of the Code of Iowa (some of which, in force prior to the issuance of said certificate, are set forth); that it is therein stated that the Insurance Commissioner shall be the "head of the Insurance Department" and have "general control, supervision and direction over all insurance business transacted in the State"; that in section 8829 of said Code it is provided in substance that among the securities, to be held by fraternal insurance societies in trust for the purpose of the fulfillment of its certificates or contracts, are "loans upon its own certificates," where the same have been in force for at least two years, and that when a loan is made and the certificate deposited the amount of the loan shall be "a lien against such certificate"; that *prior* to the receipt of plaintiff's application for said loans, defendant was "financially embarrassed," in that it had a large part of its assets and moneys invested in "Iowa farm mortgages, real estate and bonds," which, *"under existing conditions,* it would not be feasible to sell, and, if sold, would result in a great loss to defendant and all holders of its certificates"; and that the certificates sued upon provide that the certificate, articles of incorporation, and the by-laws, rules and regulations of defendant Society, in force when said certificates were issued *or thereafter adopted,* shall constitute the contract between the parties.

That defendant's by-laws, in force *prior* to the receipt of plaintiff's applications for said cash loans and

expressly made a part of the contract between the parties, provided that defendant's board of directors should have the general management of the business affairs of the Grand Lodge, and full and complete authority in the matter of the investment of all of defendant's funds, and the general supervision and control of defendant's securities and property; that prior to the receipt of said applications, the board of directors, in pursuance of its by-laws, "adopted a rule that all certificate loans, thereafter to be made, should be made *in the order in which applications therefor were received by defendant* and *as and when funds* of defendant for payment thereof *were available,*" which rule under the provisions of the certificate issued to plaintiff became a part thereof; that from the times of the receipt of plaintiff's applications for said cash loans up to the present time, said applications "were not reached for payment in their order of receipt, nor were there any funds of defendant available for the making of such cash loans to plaintiff"; that prior to the receipt of said applications for loans, and thereafter the Commissioner of Insurance of Iowa "refused to permit this defendant to withdraw, sell or dispose of any of its securities deposited with him, for the purpose of obtaining cash to make cash loans to certificate holders"; and that on February 24, 1932, the Commissioner of Insurance of Iowa issued an order to defendant, as of that date, as follows:

"In view of the fact that there is at the present time *propositions for merger* of the A. O. U. W. of Iowa with another fraternal society, . . . and in view of the fact that the assets of your society *are somewhat impaired,* it is the *order* of the Insurance Department of Iowa that you *suspend all policy loans* until such a time that something can be worked out on the matters pending, *as it is unfair that certain*

*certificate holders in your society should receive preference over others."*

That said order of the Commissioner is still in full force and effect and has not been modified; that under section 8835 of the Iowa Code, said Commissioner "has authority to suspend or revoke the certificate of authority of this defendant if it violated the above order"; that after the receipt of said order, defendant entered into a contract of reinsurance and merger with the Ancient Order of United Workmen *of North Dakota,* which contract was approved by said Commissioner of Iowa, in accordance with section 8861 of the Iowa Code; that said Commissioner directed that the contract be submitted to a special session of the Grand Lodge of defendant; that after notice had been given of the convening of such special session, by form approved by the Commissioner and under section 8862 of the Iowa Code, said special session was held on June 24, 1932; that at that session the contract was approved by more than a two-thirds vote of the delegates present; that thereafter the Commissioner issued an order to the effect that the contract had been approved and was in full force and effect; that all this was done in accordance with sections 8865 and 8866 of the Iowa Code; that "plaintiff herein was present and participated at said special session of the Grand Lodge at which said contract was approved"; that the contract of reinsurance and merger provided *inter alia* that "the privilege of making and demanding certificate loans on the security of certificates theretofore issued by defendant *should be suspended* from the effective day of the contract, June 24, 1932, *until* such time as the Commissioners of Insurance of Iowa and North Dakota should deem it feasible and good business to reinstate such privilege"; that by the contract said provision became a part of the by-laws of defendant and constituted an

amendment thereof; and that the contract was approved by said Grand Lodge prior to the time any of the applications of plaintiff for cash loans were reached for payment in order of receipt of applications for loans from defendant's certificate holders.

That with respect to plaintiff's claimed first cause of action, the only agreement made by defendant with plaintiff, as set forth in the certificate and in plaintiff's declaration, "was an agreement to make a cash *loan* to plaintiff of $780," under certain conditions specified in the certificate; that as required therein, plaintiff executed a *loan agreement,* as per a form furnished by defendant, signed by plaintiff only; that by it "plaintiff promised and agreed *to repay* to defendant said sum of $780, on or before *December 1, 1932, with interest at 6% per annum* payable semi-annually in advance"; that *"there is no allegation* in plaintiff's declaration or affidavit of claim *showing any damage* to plaintiff by reason of the alleged failure or refusal of defendant to make said loan''; and that defendant denies that there is *due* from it to plaintiff said sum of $780, with interest from February 21, 1932, or any sum.

In the affidavit of merits there are similar allegations to those contained in the last above paragraph as regards plaintiff's other two causes of action, based upon the two other certificates.

After reviewing plaintiff's declaration, the certificate sued upon, and defendant's affidavit of merits, we are of the opinion that the affidavit *stated* good defenses to plaintiff's causes of action and that the trial court erred in striking the affidavit and in entering the judgment appealed from against defendant without a hearing. It appears that defendant is a fraternal insurance society, organized and operating for the mutual benefit of *all* of its members; that in the certificates is contained an express reservation of de-

fendant's right to amend its by-laws, rules and regulations, and it is expressly stated in each certificate that it, plaintiff's application for insurance, the articles of incorporation of defendant and "the by-laws, rules and regulations of the Society, now in force *or which may hereafter be enacted or adopted,*" shall together constitute the contract between the Society, the member and the beneficiary; that in two of the certificates it is provided that after plaintiff has continuously been a member of the Society for 15 years, each has a certain "cash loan value," and that plaintiff, upon his written application for a cash loan, is entitled to receive from defendant under certain conditions, cash loans in stated amounts; and that as to the third certificate, after a membership of six years and upon a similar application, plaintiff is entitled to receive a cash loan in the stated amount. It further appears that on February 15, 1932, plaintiff made written applications to defendant, on blanks furnished by it, for the three loans and executed three loan agreements, providing for the repayment of the loans at stated times, but that defendant either failed or refused to make the loans. It is alleged in defendant's affidavit of merits, as reasons for not making the loans, that "*prior* to the receipt of plaintiff's applications" defendant was "financially embarrassed," in that it had a large part of its moneys and assets invested in "Iowa farm mortgages, real estate and bonds," which "under existing conditions" it would not be feasible to sell, and, if sold, would result in great loss to defendant and all holders of certificates; that *also prior* to the receipt of plaintiff's applications, defendant's board of directors in pursuance of its by-laws had "adopted a rule" that all certificate loans, thereafter to be made, should be made in the order in which applications therefor were received and "*as and when funds* of defendant for payment thereof

were available''; that when the applications were received no funds of defendant were available for the making of the loans; that *also prior* to the receipt of the applications, the Insurance Commissioner of Iowa (acting under authority of the Iowa Statutes or Code) refused to permit defendant to withdraw, sell and dispose of any of its securities in order to obtain cash for the making of cash loans to certificate holders; that on February 24, 1932 (i. e., nine days after plaintiff had made his applications) the Commissioner issued an order to defendant directing it to ''suspend all policy loans'' until ''something can be worked out on the matters pending,'' and for the reasons (as stated in the order) that ''propositions for merger'' of defendant with another fraternal society are pending, that defendant's assets ''are somewhat impaired,'' and that ''it is unfair that certain certificate holders in your society should receive preference over others''; that under said Code the Commissioner ''has authority to suspend or revoke the certificate of authority of this defendant if it violated the above order''; that after the receipt of the Commissioner's order defendant entered into a contract of reinsurance and merger with a mentioned fraternal insurance Society of North Dakota; that on June 24, 1932, at a duly assembled meeting of defendant society, at which plaintiff was present and participated, the contract of reinsurance and merger was approved by a two-thirds vote of the members and also by said Commissioner; that in the contract it was provided *inter alia* that ''the privilege of making and demanding certificate loans on the security of certificates theretofore issued by defendant *should be suspended* . . . until such time as the Commissioners of Insurance of Iowa and North Dakota should deem it feasible and good business to reinstate such privilege.''

We are of the opinion that the foregoing allegations disclose prima facie that defendant was justified in

failing or refusing to make the cash loans in question.
Although the prior by-laws and rules of defendant, as
well as the certificate sued upon, provided for the mak-
ing of the loans, still plaintiff had agreed, when he
received his certificates, that his insurance, as well as
his privilege of obtaining cash loans on the certificates,
were subject, not only to the by-laws, rules and regu-
lations of the Society then existing but also those that
might thereafter be enacted. It sufficiently appears
that the by-laws, rules and regulations, particularly as
regards the privilege of certificate holders of receiving
cash loans in certain stated amounts when applied for
in writing, were so amended as to suspend for an in-
definite time such privilege, because of defendant's
impaired financial condition. We understand that it
is the law of this State that such amendments, under
such a contract, would be binding upon a certificate
holder in a fraternal insurance society. In *Fullen-
wider v. Supreme Council Royal League,* 180 Ill. 621,
626, it is said: "The contract requiring compliance
with any by-laws that might thereafter be enacted, and
the certificate being accepted with such a clause there-
in, there is no vested right of having the contract in
the certificate remain unchanged, because the recog-
nition of the power to make new by-laws is necessarily
a recognition of the right to repeal or amend those
theretofore made. While courts strongly disfavor any
alteration or change in an insurance contract without
the assent of the insured, yet where the contract does
reserve to the corporation the right, from time to time,
to amend its rules or by-laws and binds the assured to
compliance with such rules or by-laws, and such pro-
vision is expressly assented to in writing by the as-
sured, it cannot be said that it would be an extraor-
dinary power to make such change, and such a contract
would not meet with disfavor from the courts." (See,
also, *Steen v. Modern Woodmen,* 296 Ill. 104, 110, 111;

*Pold v. North American Union,* 261 Ill. 433, 436.) And, under the existing conditions as alleged at the times of such amendments to the by-laws or rules, we see nothing unreasonable or unjust in the amendments. Furthermore, it appears that the Insurance Commissioner of Iowa, acting under statutory authority, ordered defendant for reasons specifically stated, to *suspend* making any more certificate loans, and that if it violated such order the Commissioner had the power and authority to revoke defendant's right to continue doing business as a fraternal insurance society. In *Morgan v. Cook,* 213 Ill. App. 172, 176, it is said: "The rule is that the performance of a contract is excused where there is a subsequent inability of performance by some action or under the authority of the government; in such cases the promisor is discharged." (See also 9 Cyc., pp. 629–631.)

Inasmuch as it appears that each of plaintiff's applications was accompanied by a "loan agreement," signed by plaintiff on a form furnished by defendant, wherein plaintiff promised to repay the amount on or before a stated date "with interest at 6 per cent," and as in plaintiff's declaration it is not alleged that he suffered any special damage because of defendant's failure or refusal to make the loans, defendant's counsel further contend that plaintiff is not entitled to recover any sum in the present action, because a breach of a contract to make a loan, standing by itself, involves no legal damage. We agree with the contention. In 1 Sutherland on Damages, 4th Ed., sec. 76, p. 274, it is said: "The utmost liability of a person who breaches his contract to loan money, in the absence of notice of special circumstances, is for the increased interest the other person was obliged to pay." In 3 Williston on Contracts, 1920 Ed., Sec. 1411, it is said: "Breach of a contract to lend money for whatever period at the current rate of interest, or at

whatever rate of interest for no definite time, involves no legal damage, unless consequential damages are recoverable.'' In 2 Sedgwick on Damages, 9th Ed., Sec. 622, it is said: "Upon breach of a contract to loan money, if no special damage is shown, the recovery is only nominal. For though by the contract plaintiff would receive the amount of the loan, it would be saddled with an obligation of exactly equal amount, so that the profit of the contract would be nothing. It is clear, however, that a contract to loan money at less than the current rate of interest would give the right to substantial damages equal to the difference between the current rate and the agreed rate. If the borrower could get the money elsewhere, no consequential damages can be recovered for breach of the agreement, except the actual cost of obtaining another loan, which may be recovered.'' (See, also, *Avalon Construction Corp. v. Kirch Holding Co.*, 256 N. Y. 137, 141; *Turpie v. Lowe*, 114 Ind. 37, 53, 54.) In the *Avalon* case it is said: "When money is loaned . . ., and the debt is not paid when due, obviously the delay occasions the creditor nothing more than a temporary loss of the use of his money. For this loss, the law compensates the creditor with an award of no greater or other sum than legal interest. . . . Logically, a prospective borrower, whose contract for a loan has been breached, should stand in no better case. His money loss is likewise nothing else than the loss of its use for a limited period. . . . Reason compels, and all authority supports the conclusion that a breach of contract to make a loan, standing by itself, involves no legal damage.''

The above principles have been applied in a case involving the breach of an agreement by an insurance company to lend money to the insured upon his making written application for the loan, agreeing to pay interest thereon, and assigning the policy to the com-

pany as collateral security, viz., *New York Life Ins. Co. v. Pope,* 139 Ky. 567. It appears from the court's opinion that the policy, while in the insured's possession, had been burned and destroyed, and the company's secretary, by a statement attached to a true copy, had certified that the policy (as evidenced by the copy) was in force and had been since May 5, 1894; that the policy provided that the company would "make *advances as loans* upon this policy at the 5th or any subsequent anniversary of the insurance" under certain conditions, among which were (a) that all premiums had been paid, (b) that the policy should be assigned to the company as collateral security for the loans, (c) that 5 per cent interest on the loans should be paid by the borrower, (d) that the loans should be for such time as the borrower might elect, not longer than the accumulation period, and (e) that the "aggregate amount of loans outstanding from the 6th to the 10th years, inclusive, should not exceed $212"; that shortly after the insured had paid the premium due on May 5, 1899, he made written application for a loan of $212, depositing with the company the copy of the policy, duly assigned, as collateral security; and that the company refused to make the loan. It further appears that the insured brought suit by petition for a rescission of the contract, and sought to recover all the premiums paid, with interest, and damages in addition, which were alleged to be "the difference between the cost to the insured of obtaining similar insurance at his advanced age over that required by his age when the contract was made"; that the trial court refused to adjudge the return of the premiums, but did adjudge damages in accordance with the plaintiff's contention as follows:

"It is shown by the pleadings and evidence that the annual premium paid by plaintiff on said policy was $92.20, and that the amount of such premium he

would be compelled to pay on a similar policy at the age of 51 years would be $121.74, and that the difference is $29.54, and that the amount per annum for a period of twenty years (the life of the policy sued upon) amounting to a total amount of $590.80, is the amount plaintiff ought to recover as damages herein.''

The trial court entered a judgment against the company in that sum. In reversing the judgment with directions to dismiss the petition, and after stating in substance that the only question involved was what was the proper measure of damages because of the company's breach of the contract to make the loan of $212, the Supreme Court of Kentucky said in part (pp. 571, 572):

''Assuming that the copy of policy attached to the certificate of the company's secretary, entitled the insured to all benefits given him by the original paper, the question then is, what was the measure of damages to which appellee was entitled? In contemplation of law, money is always in the market at the legal rate of interest. If it cannot be had from one, it may be from another. . . . The law has fixed its value incontestably. If it is due *to be paid* on a contract, and is not paid, the law likewise fixes the measure of damages for the breach; that is, the legal rate of interest. . . . But here the agreement was *not to pay* but *to loan* appellee $212. When loaned, appellee would have owed it to appellant, and been bound to repay it. It is not charged that appellee desired to apply the loan to any special use, of which appellant had notice, nor is it charged that appellee could not have procured the loan from other sources. . . . So, in this case, he would have had to pay for the money; that is, he would have had to repay the $212, and in addition the agreed rate of interest for the time used, not exceeding the lawful rate. Therefore, it would seem that if he could have got the same sum of money elsewhere on a

loan, at 5 per cent interest, he was not damaged at all. If he was compelled to pay and did pay more interest than 5 per cent, *then* the difference, up to the legal rate, is the extent of his injury, and consequently must be the measure of his damage.''

But counsel for plaintiff contend that the judgment appealed from (i. e., for the aggregate amounts stated in the certificates which defendant failed or refused to loan) is proper. The argument is in substance that defendant's several agreements were to make *payments* of said amounts (stated in each certificate as ''cash loan''), and were *not* agreements for *loans,* ''though so denominated.'' We do not think there is any merit in the contention. The words used are ''cash loan,'' and ''the word 'loan' implies an obligation to repay.'' (38 Corpus Juris, sec. 6, p. 128; *Herlihy v. Coney,* 99 Maine 469, 471; *Payne v. Gardiner,* 29 N. Y. 146, 167; *Omaha Nat. Bank v. Mutual Ben. Life Ins. Co.,* 81 Fed. 935, 938, 939.) And what is said in the case last cited is here particularly in point, viz., ''The certificate designates it as a 'loan,' the amount bears 'interest' and it is made a lien on the policy until 'paid.' No doubt the company's main reliance is upon this lien because of its effectiveness, but personal liability is not expressly or necessarily excluded.'' Furthermore, it appears from the present certificates that one of the conditions mentioned therein, as to the making of the loans, is that the insured ''executes a *loan agreement,* as per a form to be furnished by the Society,'' and in defendant's affidavit of merits it is alleged that, in the loan agreement executed by plaintiff when he applied for the $780 loan, he ''promised and agreed to *repay* to defendant said sum of $780, on or before December 1, 1932, with interest at 6 per cent per annum.'' Plaintiff's counsel, in arguing their present contention, particularly rely upon certain holdings in *Orleans Parish v. New York Life Ins. Co.,*

216 U. S. 517, in which case, on a bill filed by the insurance company to restrain the collection of certain taxes assessed against it as being contrary to the fourteenth amendment, the company had a decree in the lower court, and it appeared that the taxes were based upon an assessment against it for certain credits, amounting to $568,900, whereas it claimed it had no credits in the State of Louisiana. In affirming the decree the Supreme Court said in part (pp. 521, 522, italics ours):

"The so-called credits arise out of transactions denominated policy loans and premium lien note loans, which are explained at length by the judge below, but which may be summed up more shortly here. When the plaintiff's policies have run a certain length of time and the premiums have been paid as due, the plaintiff becomes bound ultimately to pay what is called their reserve value, whether the payment of premiums is kept up or not; and this reserve value increases as the payments of premiums go on. A policy holder desiring to keep his policy on foot and yet to profit by the reserve value that it has acquired, may be allowed at the plaintiff's discretion to receive a sum not exceeding that present value, on the terms that on the settlement of any claim under the policy the sum so received shall be deducted with interest (the interest representing what it is estimated that the sum would have earned if retained by the plaintiff); and that on failure to pay any premium or the above mentioned interest, the sum received shall be deducted from the reserve value at once.

"This is called a loan. It is represented by what is called a note, which contains a promise to pay the money. But as the plaintiff never advances more than it already is absolutely bound for under the policy, it has no interest in creating a personal liability, and therefore *the contract on the face of the note goes on to provide that if the note is not paid when due it*

*shall be extinguished automatically by the counter credit for what we have called the reserve value of the policy.* In short, the claim of the policy holder on the one side and of the company on the other are brought into an account current by the very act that creates the latter. *The so-called liability of the policy holder never exists as a personal liability, it never is a debt, but is merely a deduction in account from the sum that the plaintiff ultimately must pay.* In settling that account interest will be computed on the item for the reason. that we have mentioned; *but the item never could be sued for,* any more than any other single item of a mutual account that always shows a balance against the would-be plaintiff. In form it subsists as an item until the settlement, because interest must be charged on it. In substance, it is extinct from the beginning, because, as was said by the judge below, it is a payment, not a loan.''

Plaintiff's counsel contend that the above holdings sustain their contention in substance that the loan values, mentioned in the certificates in question, represent amounts *now due* from defendant because of defendant's refusal to make the *loans* requested, and this notwithstanding the fact that in plaintiff's applications for the loans he executed a ''loan agreement,'' wherein he promised to repay the loans, with six per cent interest, at a certain stated date. We cannot agree with the contention. The italicized portions of the Supreme Court's opinion disclose, we think, a marked difference between the terms of the contract in that case and the contract in the present case, and that said opinion cannot be held to be an authority sustaining counsel's said contention.

Our conclusion is that the judgment appealed from should be reversed and the cause remanded, and such will be the order.

*Reversed and remanded.*

SCANLAN, P. J., and SULLIVAN, J., concur.